**James A. and Audrey J. WARNER, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Jerrie D. and Leta J. SCHOOLEY, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 22174, 22174-A.**

United States Court of Appeals Ninth Circuit.

Sept. 16, 1968.

Myron E. Anderson (argued), Boise, Idaho, for appellants.

G. W. Wiprud (argued), Atty., Dept. of Justice, M. Rogovin, Asst. Atty. Gen., Lester R. Uretz, Chief Counsel, R. C. Pugh, Acting Asst. Atty. Gen., M. Rothwacks, H. Baum, H. J. Feldman, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before HAMLIN and MERRILL, Circuit Judges, and WHELAN, District Judge.*

HAMLIN, Circuit Judge:

This is an appeal from a decision of the Tax Court of the United States. The Tax Court's opinion is reported at 48 T.C. 49. The Tax Court found that the

---

* Honorable Francis C. Whelan, United States District Judge, Central District of California, sitting by designation.

petitioners had certain deficiencies in income tax for the taxable year of 1963 in that they reported certain losses as ordinary losses when they should have been reported as capital losses. The Tax Court had jurisdiction under 26 U.S.C. §§ 6212, 6213, 6214. We have jurisdiction over the appeal under 26 U.S.C. §§ 7482, 7483. The following facts give rise to this dispute:

Sewmor Sewing Center, Inc., was an Idaho corporation wholly owned by James Warner, engaged in the sewing machine and vacuum cleaner sales business in Boise, Idaho. Sewmor had an excellent group of steady employees, averaging about ten in number. While there was a substantial turnover of employees in the industry generally, Sewmor had not advertised for employees for a period of over six years. James Warner was himself an employee of Sewmor, as was the other petitioner, Jerrie Schooley.

Anxious to maintain the loyalty and continued services of its employees, Sewmor established an incentive plan. To implement this plan a new corporation was formed, called Ranchers, Inc. The plan was that the employees of Sewmor would invest seven percent of their gross salaries in Ranchers and that sum would be matched by Sewmor. The stock, however, was to be owned by the individual employees. As employees, both Warner and Schooley owned stock in Ranchers. In 1963, Ranchers was forced to liquidate, and the stockholders took a considerable loss. Both Warner and Schooley (and their wives, since they both filed joint returns) declared such loss as an ordinary loss on their 1963 income tax returns. In so doing they were trying to take advantage of section 1244 of the 1954 Code. The Commissioner, and ultimately the Tax Court, held that the Ranchers' stock did not meet the requirements of section 1244 and that therefore petitioners were only entitled to the loss as a capital loss.

Thus, the sole issue in this case is whether or not petitioners' stock holdings in Ranchers complied with the requirements of section 1244. This section was designed to encourage investment in small businesses by allowing that losses incurred from such investment be accorded ordinary loss treatment, rather than capital loss treatment as would occur from regular stock losses. The section defines small business corporations in terms of size and capitalization, and then provides that stock in those corporations shall be considered "section 1244 stock" if it was part of a particular type of offering. The nature of such offering is covered with great specificity.[1]

---

I. Section 1244(c) provides:

(c) Section 1244 stock defined.—

(1) In general.—For the purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) Such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with re-

Ranchers, Inc., was organized under the laws of the State of Idaho, and granted its charter on December 29, 1961. Its authorized capital was $100,000, divided into 10,000 shares of common stock at $10 per share. There was only one issue of stock, which was common stock. There is no argument that Ranchers qualified as a small business corporation as defined by section 1244 insofar as its size, capitalization, and the nature of its business activity are concerned. The only contested issue is whether the offering under which petitioners acquired their stock comported with the specific requirements of the statute.

At its first board meeting, held on January 5, 1962, the following resolution was unanimously adopted:

"BE IT RESOLVED that 3,000 shares of stock of Ranchers, Inc., be, and the same is hereby, set aside and allowed for purchase by the trustees of the employees of Sewmor Sewing Center, Inc., pursuant to the trust agreement attached to these minutes, and that the corporation from said 3,000 shares sell stock of the corporation to the trustees at its book value but not less than the par value, to wit, $10.00 per share; that upon receipt from the trustees of payment for said stock the same shall be issued to the trustees."

The trust agreement alluded to in this resolution was an agreement whereby a trustee would hold the funds contributed by the employees and the funds contributed by Sewmor, and would use such funds to buy Ranchers' stock, and then turn such stock over to the employees. The trust agreement provided, in part:

"(f) When said allotted stock of Ranchers, Inc., to the amount of 3,000 shares has been purchased by Trustees or on the .... day of ......., 196., whichever occurs earlier, this

spect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245) exceed the amount of gross income.

trust shall be terminated and all unused funds of each Second Party [employees of Sewmor] as shown by the account sheet of said Second Party shall be refunded to the Second Party entitled thereto and upon presentation of the trust and voting trust certificate of said Second Party to the Trustee, the stock represented by said trust and voting trust certificate shall thereupon be issued and delivered to said Second Party."

It is of particular significance that the blanks as they appear in this quote were never filled in.

The Tax Court found that at a meeting of Ranchers' stockholders and directors on February 18, 1963, it was decided to enter into a fire retardant program. They also decided (1) to purchase and did purchase a Northrup P-61 airplane, and (2) to employ Robert E. Savaria as a pilot and issue 100 shares of Ranchers stock to him for his services performed in equipping the aircraft for fire fighting purposes. On August 29, 1963, Ranchers' airplane was wrecked and Robert E. Savaria was killed. No insurance was carried on the plane, and the loss sustained made it impractical to continue on with the business. At a corporate meeting held on November 21, 1963, a unanimous resolution was adopted to dissolve the corporation and distribute the remaining assets among the stockholders.

The Tax Court held that the stock issued to petitioners under the plan could not be accorded section 1244 treatment because the plan did not comply with section 1244(c) (1) (A) which provides:

"(1) *In general.*—For purposes of this section, the term 'section 1244 stock' means common stock in a domestic corporation if—

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation.

(A) such corporation adopted a plan after June 30, 1958 to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan, * *."

The reason the Tax Court held that the questioned stock did not comply was that the plan did not specify a period ending two years after the adoption of such plan.

Petitioners argue that it had, in fact, been determined that the plan would end in two years, and that it was merely an oversight that the blanks in the trust agreement had not been filled in. They point to the fact that at the time of its inception the past earnings of Sewmor's employees indicated that all 3000 shares would be purchased within two years; that, in fact, the issue was completely sold within two years.

The government counters that the plain language of the statute requires that there be a *written* plan in which is included a termination date. For this argument the government relies on the phrase "specified in the plan." They argue that this phrase clearly indicates the Congressional intent that there be a writing including a termination date. Moreover, the government points to a Treasury Regulation, 26 C.F.R. § 1.1244 (c)–1(c), which requires that the plan, with the duration date included, be in writing.[2]

Petitioners contend that 26 C.F.R. § 1.1244(c)–1(c) is contrary to the intent of Congress, and that it is an unreasonable regulation. They urge that in en-

acting section 1244 Congress intended to give tax relief to a general class of investments, and in so doing did not intend to make the technical requirements so specific that relief would be afforded only to those who, at the initiation of their investment, planned to be covered by that section.

We see nothing unreasonable in the regulation in question. In Eger v. Commissioner of Internal Revenue, 2nd Cir., 393 F.2d 243, April 16, 1968, the Second Circuit recently considered the question of to what extent section 1244 requires a written plan. The court held that 26 C.F.R. § 1.1244(c)–1(c) should not apply because it had been promulgated after the corporation in question had been formed. They then went on to hold that corporate minutes were, under the statute, a sufficient *written plan* to comply with the statute. It is important to note that the court did not reject the idea that some writing was necessary under section 1244.

■ We needn't reach the issue of whether or not 26 C.F.R. § 1244(c)–1(c) substantially comports with Congressional purpose. In the case at bar, even if we were to hold that an oral plan was sufficient, which we do not, petitioner has still failed to prove that there was a specific parol agreement by the corporation that its stock issue plan would be completed within two years. Petitioners offered testimony showing that the corporate organizers wished to limit the length of the trust agreement (Sewmor did not want to commit itself indefinitely

---

2. 26 C.F.R. § 1.1244(c)–1(c) provides:

(c) Written plan. (1) The common stock must be issued pursuant to a *written plan* adopted by the corporation after June 30, 1958, to offer only such stock during a *period specified* in the plan ending not later than two years after the date the plan is adopted. The two-year requirement referred to in the preceding sentence will be met if the period specified in the plan is based upon the date when, under the rules or regulations of a Government agency relating to the issuance of the stock, the stock may lawfully be sold, and it is clear that such period will end, and in fact it does end, within two years after the plan is adopted. The plan must specifically state, in terms of dollars, the maximum amount to be received by the corporation in consideration for the stock to be issued pursuant thereto. See Sec. 1.1244(c)–2 for the limitation on the amount that may be received by the corporation under the plan. For purposes of section 1244, an increase in the basis of outstanding stock as a result of a contribution to capital is not an issuance of stock. (Emphasis added.)

since if business took a bad turn their contribution of an amount equal to its employees could become a severe liability) and that they anticipated that the stock issue of 3000 shares would be purchased by the employees within two years. This evidence is a long way from showing that the plan had been *limited* to a duration of two years. We can find nothing in the evidence to suggest that such a limitation was specified anywhere, much less that it was "specified in the plan" as is required by section 1244. As the Tax Court stated:

"We cannot agree with petitioners that external computations, particularly computations as essentially uncertain as those involved herein, satisfy the explicit requirements of section 1244(c) (1) (a) that the offering *must* end not later than 2 years after the date of the plan's adoption and that the period in question be 'specified in the plan.' Nor does the fact that the offering did in fact end within 2 years of the plan's adoption persuade us otherwise since the conditions of section 1244(c) (1) must be met at the time the alleged section 1244 stock is issued."

We find no error in the decision of the Tax Court and we therefore affirm.