John H. **RICKEY** and Lorraine C.
Rickey, Appellants,

v.

**COMMISSIONER OF INTERNAL
REVENUE,** Appellee.

No. 26-775.

United States Court of Appeals,
Ninth Circuit.

July 19, 1974.

Hufstedler, Circuit Judge, filed spe-
·cially concurring opinion.

J. Blaine Anderson, District Judge,
concurred and dissented and filed opin-
ion.

Paul E. Anderson (argued), San Fran-
cisco, Cal., for appellants.

John A. Townsend (argued), Dept. of
Justice, Washington, D.C., for appellee.

Before KOELSCH and HUFSTED-LER, Circuit Judges, and ANDER-SON,* District Judge.

## OPINION

KOELSCH, Circuit Judge:

John H. Rickey (Taxpayer) and Lorraine C. Rickey[1] appeal from a decision of the Tax Court[2] determining a deficiency in income taxes for the tax year 1962. Our jurisdiction is founded on Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C. § 7482.

Two distinct issues are presented for review. The first is whether Taxpayer received over 30 per cent of the selling price of stock in two corporations in the year of sale, thereby precluding reporting of the gain under the installment method provided by Code Section 453, 26 U.S.C. § 453. *See* 26 U.S.C. § 453(b)(2)(ii). The second is whether a loss suffered by Taxpayer on the liquidation of a corporation qualifies under the provisions of 26 U.S.C. § 1244 for treatment as an ordinary loss. The Tax Court held against Taxpayer on both issues.[3]

## I. The "Installment" Sale

In 1962 Taxpayer owned all of the stock of Rickey Enterprises (Enterprises), a California corporation. Enterprises owned and operated a restaurant in Palo Alto, California (Rickey's), a bar-restaurant in San Francisco, California, and 90 per cent of the stock of a corporation which operated a restaurant next to Rickey's in Palo Alto. Taxpayer also owned 50 percent of the stock of Rickey's Studio Inn Hotel (Studio Inn), another California corporation; the other half was owned by two brothers, Alfred and Lewis Marsten. Studio Inn owned a large motel in Palo Alto adjacent to Rickey's, and a restaurant in Marin County, California.

In early 1962 Hyatt Corporation of America (Hyatt) sought to purchase the motel owned by Studio Inn and the adjacent restaurant, Rickey's, owned by Enterprises. Hyatt did not want any of the other assets. But, apparently because of tax considerations on both sides, the sale was ultimately cast in the form of a sale of the stock of the two corporations. To accommodate Hyatt and as part of the transaction, Taxpayer, shortly before the sale was consummated, purchased and received from the two corporations all their unwanted assets. The purchase price was set up on their books as an account receivable from Taxpayer. The contract to sell and purchase the corporate stock was then executed on March 31, 1962. The basic sales price was set at $3,600,000, subject to an immediate audit.[4] Of the

---

* The Honorable J. Blaine Anderson, United States District Judge for the District of Idaho, sitting by designation.

1. Lorraine Rickey is a party to this action solely by reason of filing a joint return with her husband.

2. The opinion of the Tax Court is reported: John H. Rickey, 54 T.C. 680 (1970).

3. The facts are exhaustively set out in the opinion of the Tax Court, and we will provide only a summary necessary for an understanding of our disposition of the issues.

4. Pragraphs 5 and 5a of the contract provided:
"(5) Anything herein to the contrary notwithstanding, it is understood and agreed by the parties that the purchase price to be paid for said shares of stock was negotiated and fixed upon the basis that the assets of each company at the time of closing, described in Exhibit E, would equal the liabilities of each of said companies at said time, other than said indebtedness to Equitable in an aggregate principal amount of $1,400,000.00. Therefore, said purchase price shall be increased by the amounts, if any, that the principal of said indebtedness owed to Equitable is less, at the time of closing, than $1,400,000.00, and by the amount, if any, that the assets of either of said companies as listed in Exhibit E exceed the liabilities of said companies, other than said indebtedness owed to Equitable.

"(5–a) Conversely, said purchase price shall be decreased by the amounts, if any, by which at the time of closing said indebtedness to Equitable exceeds $1,400,000.00 (excluding the amount of any additional borrowings made by said

pre-audit sales price, $1,400,000 was allocated to mortgage indebtedness in that amount; $1,852,000 to the stock of Studio; and $348,000 to the stock of Enterprises. The contract further provided for a payment of $250,000 upon execution and $852,000 plus interest at 4½ per cent, reflected by long-term notes. The difference between the sum of these two figures and the adjusted total sales price was to be determined and paid as follows: the difference between the down payment of $250,000 and 29 per cent of the adjusted total sales price (hereafter the Deferred Down Payment) within 30 days of the audit, the remainder (hereafter the Residual Payment) on January 2, 1963.

The contract also provided a mechanism for off-setting Taxpayer's indebtedness for the withdrawn assets against the amounts due him. Section 5-b of the contract provides:

"It is further expressly understood and agreed that in the audit as at the close of business on March 31, 1962, hereinafter provided for, all liabilities of said companies then owing to the selling stockholders and their related companies and all indebtedness of the selling stockholders and their related companies to said companies shall be offset and cancelled to the extent thereof; that each of the selling stockholders waives, releases and relinquishes all claims and demands against each of said companies which do not appear on or are reflected and accounted for in the respective audited balance sheets of said companies as of the close of business on March 31, 1962, and that after accomplishing such offsets any then remaining bal-ance of indebtedness of a selling stockholder and/or his related companies to said companies shall be paid as follows: first, by the application of the balance of the 29% installment of purchase price payable to such stockholder for his stock, provided for in paragraph 2 of this agreement; second, by the application of all installments of purchase price payable to such stockholder for his stock due on or after January 1, 1963; and third, by credit against amounts becoming due on such stockholder's promissory note."

Thus, Taxpayer was only to receive the payments on the sales price (except for the fixed sum paid on execution of the contract) after cancellation of his indebtedness to the two corporations for the withdrawn assets.

The sale was consumated on April 2, 1962. As agreed in clause 2-b, Taxpayer received $125,000 in cash and $426,000 in notes for his half interest in Studio Inn, and $100,000 in cash and $148,000 in notes towards payment for the stock of Enterprises. Immediately on closing, Hyatt liquidated the two corporations; and Taxpayer's debt to the corporations thereupon became payable to Hyatt.

The audit, completed in June, 1962, resulted in a slight reduction of the sales price. It also reduced the portion of the total sales price allocable to Studio Inn, in which the Marstens owned a half-interest, and thus entitled Taxpayer to a larger proportion of the payments. As stated in the Tax Court's opinion (54 T.C. at 686):

"The audit . . . determined an adjusted sales price of $631,605.50 for petitioner's interest in Studio Inn and

companies from Equitable with the prior written consent of Hyatt) and the liabilities of said companies other than said indebtedness to Equitable exceed the same assets of said companies as listed on Exhibit E.
Exhibit E read:
"OTHER ASSETS
"1. Cash on hand and in banks.
2. Foods and beverages.

3. All merchandise held for sale in liquor store which Hyatt alects [sic] to purchase (at cost or market value, whichever is lower).

4. The following prepaid expenses:

&ast; &ast; &ast; &ast; &ast;

5. Accounts and Notes Receivable."

$449,437.98 for petitioner's interest in Enterprises, or a total adjusted sales price of $1,081,043.48 for petitioner's interest in both corporations. The amount of each payment due petitioner under the terms of the contract . . . for his stock of both corporations is as follows:

|  | Rickey's Studio Inn Hotel | Rickey Enterprises | Total |
| --- | --- | --- | --- |
| Due at closing | $125,000.00 | $100,000.00 | $ 225,000.00 |
| Due 30 days after audit | 58,165.00 | 30,337.00 | 88,502.00 |
| Due January 2, 1963 | 22,440.50 | 171,100.98 | 193,541.48 |
| Payment due by note | 426,000.00 | 148,000.00 | 574,000.00 |
|  | 631,605.50 | 449,437.98 | 1,081,043.48 |

The amount due petitioner under the terms of the contract in the year of sale, namely the amounts due at closing and 30 days after audit, for his respective interest in each corporation represented 29 percent of the selling price of petitioner's stock in each corporation. Also, the total amount due petitioner in the year of sale for his stock in both corporations represented 29 percent of the total selling price of his stock in both corporations."

The audit also revealed that Taxpayer "owed" the two corporations (and hence, after their liquidation, Hyatt) the net sum of $466,398.83 for the withdrawn assets. This sum was considerably larger than the parties had anticipated. As already noted, the contract provided for interest on Hyatt's long-term indebtedness to Taxpayer; however, it contained no such provision with respect to Taxpayer's debt, undoubtedly because the parties did not anticipate that the latter debt would exceed the sum of the Deferred Down Payment and the Residual Payment. Thus, because of the size of Taxpayer's debt, Hyatt was unexpectedly confronted with the prospect of paying interest on long-term notes, the principal of which, because of the offset provisions of the contract, Hyatt would never have to pay—to follow the logic of the contract, Taxpayer "owed" Hyatt money on which he was not obligated to pay interest at the same time that Hyatt "owed" Taxpayer money on which interest was accruing.

When Hyatt threatened to rescind the contract, Taxpayer made some payments on his debt, but these were relatively small, and Hyatt remained dissatisfied.[5]

However, on August 29, 1962, the parties succeeded in amicably resolving the problem. As evidenced by letter agreement of even date, they in effect offset the Residual (and Deferred Down) Payment *pro tanto* against Taxpayer's debt to Hyatt and provided that Taxpayer would pay interest from September 1, 1962, on the remainder.[6]

In his tax return for 1962 Taxpayer reported his gain from the sale of his stock in Enterprises and Studio Inn as an installment sale in that year. The Commissioner rejected the installment method of reporting, concluding that Taxpayer had effectively received the 1963 Residual payment in 1962, thereby

5. Taxpayer's payments, amounting to $76,763.86 reduced his debt from $466,398.83 to $389,634.97.

6. The letter agreement contains this recital: "As of this date (August 29, 1962) Hyatt is owed $120,036.11 by you as a result of an overpayment in connection with the contract dated March 31, 1962 for the purchase of Rickey's."

receiving more than the permissible 30 per cent of the sales price in the year of sale. The Commissioner computed the year of sale payments as follows:

|  | Enterprises | Studio Inn | Total |
|---|---|---|---|
| Sale price of capital stock | $449,437.98 | $631,605.50 | $1,081,043.48 |
| Payments in year of sale | 100,000.00 | 125,000.00 | 225,000.00 |
|  | 30,337.00 | 58,165.00 | 88,502.00 |
|  | 171,100.98 | 22,440.50 | 193,541.48 |
|  | 301,437.98 | 205,605.50 | 507,043.48 |
| Percent of sales price | 67 | 32.55 | 46.93 |

The Tax Court sustained the Commissioner. It held that Taxpayer received the $193,541.48 payment as income in the year of sale because an equivalent amount of Taxpayer's indebtedness to Hyatt for the assets retained was effectively set off against Hyatt's indebtedness to Taxpayer in 1962.[7] The Tax Court rested decision on two separate bases: (1) that analysis of the substance of the transaction under familiar tax principles requiring attribution of income to the year of actual receipt indicated that $193,541.48 of Taxpayer's debt to Hyatt was cancelled in 1962; and, alternatively, (2) that the letter agreement of August 29, 1962, had the effect of contractually accelerating the payment due January 2, 1963, into the year of sale.

Taxpayer has ignored the first holding and concentrated his attack on the second. Because we conclude that the Tax Court's first holding is correct, we need not, and do not, express an opinion on the merits of the alternative holding.

It is fundamental that the "incidence of taxation depends upon the substance of a transaction . . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective adminis-tration of the tax policies of Congress." Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). Applying this principle, the Tax Court held that the contractual provision for cancellation of the mutual debts on January 2 of the next year simply postponed technical receipt without deferring the actual enjoyment of over 30 per cent of the gain from the sale. The Tax Court stated:

"We think it clear that the payment of $193,541.48 was effectively received by petitioner in 1962 (the year of sale) . . . . As we view the transaction, petitioner deferred payment of that portion of the noninterest-bearing payments which exceeded 29 percent of the selling price, to wit, $193,541.48, solely for the purpose of altering his tax liability. While we recognize that a taxpayer may deliberately arrange the terms of a sale so he will receive less than 30 percent of the sale price in the year of sale, nevertheless to so qualify the arrangements must have substance and reflect the true situation rather than being merely the formal documentation of the terms of the sale. Here petitioner did this with the knowledge that, by virtue of the provision requiring this amount to be offset against his indebtedness to Hyatt, he would never

---

7. The benefit received from discharge of a debt is taxable income. 26 U.S.C. § 61(a)(12).

receive this payment in the form of cash.[4]

\*     \*     \*     \*     \*

"4. By purchasing the assets Hyatt did not want through the establishment of accounts receivable it was obvious from the beginning that Hyatt would never be called on to pay the $193,541.48. Petitioner retained possession of assets worth more than that at all times." 54 T.C. at 694.

We agree. The parties' agreement to a selling price for the stock "inflated" [8] by the value of assets Hyatt did not want to purchase maximized the amount Taxpayer would receive in the year of sale (and the amount of stepped-up basis Hyatt would receive on liquidation of the corporations). The contract operated so that regardless of the value of the assets transferred to Taxpayer, the post-audit adjusted sales price of the stock reflected only variations in the assets and liabilities of the motel and restaurant Hyatt purchased—the assets Taxpayer bought were reflected on the corporations' books by a corresponding asset, his account receivable. Because Taxpayer's debt exceeded the sum of the Deferred Down Payment and Residual Payment, the offset was inevitably an empty gesture entailing only book entries. [9]

■ The Tax Court properly disregarded such formalism. Section 453 is a remedial provision designed to alleviate the hardship to taxpayers who do not receive cash or other assets in the year of sale sufficient to pay the tax on a large gain—30 per cent is the statutory dividing line between those Congress thought in need of relief and those not. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S. Ct. 695, 92 L.Ed. 831 (1948). Taxpayer does not come within the ambit of § 453 because he received benefits well in excess of 30 per cent of the sales price in 1962. See Rushing v. Commissioner of Internal Revenue, 441 F.2d 593 (5th Cir. 1971). Indeed, Taxpayer received the assets, which created the debt to be cancelled in the following year, not only in the year of sale, but even before the sale. Recasting the transaction, it is apparent that of his portion of the sales price, $1,081,043.48, Taxpayer received $250,000 in cash plus assets more than sufficient to make the benefits received from the sale exceed 30 per cent of the sales price. Payment for the assets by creation of a debt technically to be cancelled in the future [10] was simply a formal device, appropriately disregarded, to avoid the tax consequences of receipt of over 30 per cent of the sales price.[11]

■ Taxpayer alternatively contends that he is at least entitled to installment treatment on the proceeds of his Studio Inn stock. He argues that the sale of the two corporations was each a separate event, and that the cash payments made to prevent Hyatt from rescinding were repayments of the cash downpayment. He points out that if the propor-

8. *Cf.* Tombari v. Commissioner of Internal Revenue, 299 F.2d 889 (9th Cir. 1962).

9. United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968); Williams v. United States, 219 F.2d 523 (5th Cir. 1955); James Hammond, 1 T.C. 198 (1942). See J. Earl Oden, 56 T.C. 569 (1971); Everett Pozzi, 49 T.C. 119 (1967).

10. Taxpayer argues that his debt was owed to the two corporations, not Hyatt, and that Hyatt's right to offset amounts which it owed Taxpayer against amounts he owed the corporations resulted solely from the liquidation of the corporations, over which he had no control. While Taxpayer may not have controlled the liquidation, it was certainly anticipated. Clause 5-b of the contract provides for cancellation of Taxpayer's indebtedness to the corporations against Hyatt's obligation to pay (a) the 29 per cent installment, (b) the January 2, 1963, payment, and (c) the long-term notes. The parties necessarily anticipated liquidation of the two corporations prior to Taxpayer's payment for the withdrawn assets—the clause allowing the offset is otherwise meaningless.

11. Regardless of whether or not the August 29, 1962, letter agreement contractually accelerated the offset, we think the letter is evidence of the substance of the transaction —the parties regarded the debts as offset at that time, at least as a practical matter, if not legally.

tion of the repayment allocable to Studio Inn is deducted from the year-of-sale payments for that corporation, the amount received for Studio Inn in the year of sale is less than 30 per cent, even with an accelerated offset. The simple answer to Taxpayer's contention is that the Tax Court found:

"This argument can.be readily dismissed as being completely unsupported by the *actual* facts. The $76,763.86 paid by petitioner to Hyatt went to reduce the amount of petitioner's indebtedness to Hyatt and was not a partial refund of the downpayment for the stock." 54 T.C. at 698.

The finding is amply supported by the evidence; indeed, it is dictated by the schedule attached to the August 29, 1962, agreement.[12]

## II. The Section 1244 Loss

■ Taxpayer, relying upon 26 U.S. C. § 1244, applied ordinary, as distinguished from capital, loss treatment to a

12. Moreover, we also agree with the Tax Court, *see* 54 T.C. 698, that characterization of the payments as repayments of an excess down payment would not alter the percentage Taxpayer received in the year of sale. As the total sales price was never reduced, any reduction in the down payment would necessarily be balanced, under the terms of the contract, by an increase in the 29 per cent payment or in the January 2, 1963, payment, in order to pay the total sales price without issuing more notes (which was not done). As the initial fixed payment, the payment due 30 days after audit, and the January 2, 1963, payment are all attributable to the year of sale, the percentage received in the year of sale is constant regardless of how payments are assigned to the three periods.

13. 26 U.S.C. § 1244, so far as pertinent, reads:

"(a) *General Rule.*—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset."

substantial loss suffered upon the liquidation of a domestic corporation in which he was the sole shareholder.[13] The Commissioner, however, ruled that the stock was not within purview of that statute.[14] The Tax Court agreed. It held that the "written plan"[15] relied on by Taxpayer, consisting of the corporate minutes, resolutions, an application to the Commissioner of Corporations for a permit to issue shares, and the permit itself, was defective in two respects. First, that the corporate writings[16] did not disclose in terms that the stock was issued in order to obtain the benefits of § 1244, and therefore failed to satisfy the requirement that the corporation's plan be one "to offer such (*i. e.*, § 1244) stock . . ." Second, that an offering period for the stock ending "not later than two years after the date the plan is adopted" was not specified in the plan.

The first ground relied on by the Tax Court is dispositive; we do not reach the second.

14. 26 U.S.C. § 1244(c)(1)(A) reads:

"(c) Section 1244 stock defined.—

"(1) *In general.*—For purposes of this section, the term 'section 1244 stock' means common stock in a domestic corporation if—

"(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan. . . ."

15. *See* Treas.Reg. § 1.1244(c)–1(c)(1); H. R.Rep.No. 2198, 85th Cong., 2d Sess. 8 (1958), reprinted in 1959–2 Cum.Bull. 709, 714.

16. Under Eger v. Commissioner of Internal Revenue, 393 F.2d 243 (2d Cir. 1968), a corporation's minutes are adequate to satisfy the requirement that the plan be in writing, and if they otherwise satisfy the statutory prerequisites, will qualify as a § 1244 plan. The Tax Court did not reject Taxpayer's contention that the minutes of the corporation's organizational meeting constitute a written plan; rather it held that the plan did not satisfy the statute because it was not a written plan to issue § 1244 stock.

Courts called on to interpret § 1244 have uniformly upheld the Commissioner's position that a qualifying § 1244 plan must provide evidence that the stock is being issued with § 1244 in mind. Anderson v. United States, 436 F.2d 356 (10th Cir. 1971); Godart v. Commissioner, 425 F.2d 633 (2d Cir. 1970); Childs v. Commissioner, 408 F. 2d 531 (3rd Cir. 1969); Spillers v. Commissioner, 407 F.2d 530 (5th Cir. 1969). This interpretation of the statute conditions the tax incentive provided for small business investment "both on doing certain things *and* on showing in an objective way that they were done with an intention of realizing the benefits Congress had afforded." (*Godart, supra,* 425 F.2d at 637.) Taxpayer argues this is an unreasonable interpretation of the statute. He contends that Congress is ordinarily not interested in a taxpayer's knowledge of tax law, but rather in the performance of the substantive acts which the tax benefit is designed to induce. Here, he maintains, the investment in the liquidated corporation had all the Congressionally desired characteristics set out in the statute, and he argues that he should be entitled to the benefits of the section without an explicit designation of the Code section in the qualifying plan.

■ Taxpayer's argument misconstrues the purpose of § 1244. The section was not intended to provide general tax relief for all small business investment losses. It was passed during the business recession of 1958 and was designed "to increase the volume of outside funds which will be made available for the financing of small businesses. . . ." H.R.Rep.No. 2198, 85th Cong., 1st Sess. (1958), reprinted in 1959–2 Cum.Bull. 709, 710. By passage of § 1244, Congress did not intend to establish a broad exception, with potentially large losses to the Treasury, from the ordinary capital loss treatment provided small business investment losses. As noted by Judge Friendly in *Godart*: "The House Report [indicates] that

budgetary considerations required that any tax reductions accorded small businesses be kept at a minimum. . . ." 425 F.2d at 637.

Congress therefore sought to provide tax benefits only to those additional investments which in fact were stimulated by the tax incentive. The section excluded investments already made, operating only prospectively. And, in order to exclude those investments which clearly would have been forthcoming without the stimulation provided by § 1244, Congress required a written "plan . . . to offer such (*i. e.,* § 1244) stock"— a plan which evidences that the corporation is aware of § 1244. While not completely limiting the benefits of the section to investments which would not be made but for the inducement provided, the requirement at least insures that investments made without knowledge of § 1244 will not be subsidized. In short, Congress conditioned the tax benefit on knowledge of the incentives of § 1244 in order to limit the tax cost spent to obtain the same additional investment. *See Godart, supra,* at 637–638.

The judgment of the Tax Court is affirmed.

HUFSTEDLER, Circuit Judge (specially concurring):

I concur fully in my brother Koelsch's rationale in disposing of the section 453 issue. I reach his result in deciding the section 1244 issue, but by a different path.

I would not adopt the reasoning of Judge Friendly in Godart v. Commissioner (2d Cir. 1970) 425 F.2d 633 and of the other cases of Judge Friendly's persuasion that Judge Koelsch has collected. The requirement that "there must be some substantially contemporary objective evidence that the plan was adopted with § 1244 in view" (425 F.2d at 638), when applied to disqualify a plan that follows all of the objective criteria of section 1244, attributes to

Congress an unreasonably mystical approach to business financing.[1]

Rather, I think that the issue is controlled by Warner v. Commissioner (9th Cir. 1968) 401 F.2d 162. *Warner* struck down an otherwise qualifying plan because the plan did not contain terms explicitly requiring that the stock be sold within the requisite two-year period. *Warner* could have applied section 1244 and 26 C.F.R. § 1.1244(c)–1(c) less mechanically, but *Warner* is the law of this circuit, and it disqualifies Rickey's plan.

J. BLAINE ANDERSON, District Judge (concurring and dissenting):

I have no hesitancy in concurring with the disposition as to the section 453 issue.

The peculiar and special facts in this case, and the timing of the statute and the implementing regulations, all dealt with in more detail hereinafter, compel this dissent on the section 1244 issue. Warner v. Commissioner, (9th Cir. 1968) 401 F.2d 162, does not, in my opinion, require the result reached by Judge Hufstedler nor by Judge Koelsch in his reliance on Godart v. Commissioner, (2nd Cir. 1970) 425 F.2d 633. Some elaboration seems necessary to an understanding of the point of this dissent.

On June 17, 1960, petitioners incorporated "The Shack" under the laws of the State of California. An organizational meeting was held on June 27, 1960, and J. H. Rickey was elected president. The Shack was authorized to issue a total of 2,000 shares of stock at a par value of $100.00. A resolution was adopted authorizing the corporation to issue not more than 200 shares to J. H. Rickey. Is is apparent from reading the resolution that it was mandatory in its language and direction, requiring the officers to immediately comply with the terms of the permit. The resolution stated, in part:

> "that *upon issuance* of a Permit by the Commissioner of Corporations of the State of California, pursuant to such Application, the President and/or the Vice-President and the Secretary be, and they are hereby authorized—*and directed to sell and issue shares of stock of this corporation* to any or all of the above-named individuals in the amounts and for the consideration stated in and in compliance with all the terms and conditions of such Permit and these resolutions." (emphasis supplied)

In July, 1960, an application for a permit to issue shares in accordance with the above resolution was filed with the Commissioner of Corporations. On July 19, 1960, the Commissioner issued his permit to The Shack, authorizing it to sell 200 shares of its stock to petitioners for $100.00 per share. The permit stated:

> "That unless revoked or suspended, or renewed upon application filed on or before the date of expiration specified in this condition, all authority to sell securities under paragraph I of this permit shall terminate and expire on January 30, 1961 . . ."

On July 22, 1960, The Shack issued 200 shares to J. H. Rickey in return for $20,000.00 in cash. In December, 1963, The Shack, since renamed "Rick's Swiss Chalet", was liquidated at a loss. Of the total amount lost, $17,673.86 was attributable to the capital stock contribution. The Commissioner disallowed this loss as an ordinary loss pursuant to 26 U.S.C.A. Section 1244,[1] 26 C.F.R. 1.1244,

---

1. It is also curious that, although § 1244 was intended to encourage investors to commit their funds to small business corporations, *Godart* requires that the corporation have § 1244 in mind. It is not inconceivable that an investor would buy stock due to the § 1244 incentive even though the corporation in which he was investing did not have the section in mind. Such an investor's purchase of stock would serve the congressional purpose; the *Godart* requirement, however, would deny him the section's benefits.

1. See footnotes, 13 and 14, supra.

for two reasons: First, the plan did not blatantly limit the stock offering to two years, and second, that the plan did not specifically say it was a "Section 1244" plan.

Congress enacted Section 1244 of the Internal Revenue Code (effective Sept. 2, 1958) to encourage the flow of capital into small business corporations, an area of commerce where there are substantial chances of failure.[2] During the hiatus between congressional action, Sept. 2, 1958, and the promulgation of the regulation, October 8, 1960, one would need psychic qualities to comply with non-existent regulations. It is felt that any interpretation of this section should have as its goal a realistic application of congressional wording without reference to the words of the then non-existing implementing regulation.

It is, I believe, sufficient evidence of intent that he formed a small corporation, and the transactions that occurred during its formation conform to the standards set out in the statute. Given only the statute, without benefit of case law or regulations, I feel that Rickey did an adequate job of conforming to its requirements. In cases such as this, we must look to the substance of the transaction, not the form. It is basic tax law that when there is an ambiguity in the statute, doubts should be resolved in favor of the taxpayer, Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917). This has long been the rule as to other sections of the Internal Revenue Code, Sami v. United States, 277 F.2d 153 (9th Cir. 1960), and I cannot see why it should be different with Section 1244 standing alone without the guiding regulation. I feel that this policy is especially true in this case as the appellant

was without the benefit of case law or applicable regulations to guide him at the time of the formation of the corporation.[3] It was sometime later that anyone in the legal or accounting professions learned of the strict interpretation and application the IRS was to make of this statute.

In 33 St. John's Law Review 172 (1958) there was a short discussion of new legislation. Section 1244 stock was one of the subjects mentioned and the following comment should be noted:

> "Section 1244 stock must be issued pursuant to a corporate plan. While the statute is silent as to the form of such plan, the report of the House Ways and Means Committee specifies that such plan must be in writing. At present, why any plan is required as a condition precedent to issuing 1244 stock, and what the form and content of such a plan will be, are not apparent." P. 173

It is apparent that the statute, without aid of regulations, engendered uncertainties. The statute does not even, for instance, require a written plan, only a plan.

In Godart v. C. I. R., 425 F.2d 633 (2nd Cir. 1970), a seemingly contrary result was stated. But even at the outset, Judge Friendly conceded that it was a "close question". The facts further reveal that the taxpayer did not make a Section 1244 claim on his original return, but on an amended return after the Commissioner assessed him with a deficiency. In *Godart* the corporation was formed *after* the regulations were adopted. In Childs v. C. I. R., 408 F.2d 531 (3rd Cir. 1969), the court noted that there was no mention of Section 1244 in the taxpayer's plan, a plan adopted *after*

---

2. For an interesting and informative discussion on the practicalities and policies which led Congress to pass this statute see L. Ward Wright's Utilization of Subchapter S and Section 1244 Stock, 12 Western Reserve Law Review 225.

3. The regulations pertaining to Section 1244 were not adopted until October 8, 1960 (T. D. 6495, F.R. 9675), some two and one-half months after the corporation was formed. The first appellate court decision would not appear for eight years, Eger v. C. I. R., 393 F.2d 243 (2nd Cir. 1968).

publication of the regulations, but went on to observe that:

> " . . . [T]here is nothing in the resolution of the board of directors . . . , nor in the minutes of the stockholders' meeting, which would differentiate these resolutions and minutes from the ordinary purchase of stock by a buyer and seller. Here, if any offer was made, it was made on behalf of the appellant, . . . , and the acceptance was by the corporation and the respective resolutions and minutes merely set the same forth." P. 533.

In Spillers v. C.I.R., 407 F.2d 530 (5th Cir. 1969), there seems to be little question that even if the appellant had used the term "Section 1244 stock", he would not have qualified for a Section 1244 deduction due to the numerous flaws in the formation of the corporation. In Anderson v. United States, 436 F.2d 356 (10th Cir. 1971), the appellant stipulated that at the time of formation he had no intent to satisfy the statute. The court, applying the rule in Godart, supra, 425 F.2d p. 638, said: "There must be *some* substantially contemporary objective evidence that the plan was adopted with § 1244 in view." and concluded that with the facts as stipulated, the judgment had to be affirmed. In the present case Rickey is claiming that the substance of the transactions objectively demonstrate that he had § 1244 in view, even though he did not specifically mention the statute.

The holding in Warner v. C.I.R., 401 F.2d 162 (9th Cir. 1968), is distinguishable from the one at hand. There the stock offering was not limited to two years or less by a written plan or operation of local law and regulations and the Revenue Code regulations had been published at the time this stock was offered.

The Shack was incorporated in accordance with a plan. That plan was a written plan and consisted of the minutes of the organizational meeting of the board of directors augmented by the application to the California Commissioner of Corporations for a permit to sell stock and the issued permit. Corporate minutes are sufficient writings to meet the requirements of the statute, Eger v. C. I.R., 393 F.2d 243 (2nd Cir. 1968), and those writings may be augmented by applicable state laws. I would hold that the minutes as augmented by the permit, are sufficient writings to satisfy the statute where, as here, no regulations had been adopted by the Commissioner.

The Commissioner urges that the plan must still fail for another reason, that the two-year limitation was not specifically stated in the writings. 26 C.F.R. 1.1244(c)–1(c) states, in part, that:

> "The two-year requirement . . . will be met if the period specified in the plan is based upon a date when, under the rules or regulations of a government agency relating to the issuance of the stock, the stock may lawfully be sold, and it is clear that such period will end, and in fact it does end, within two years after the plan is adopted."

These regulations were adopted after the formation of The Shack. Nevertheless, in this case there is no dispute that the stock was in fact sold in less than six months and that the permit to sell the stock was only good for six months. The Commissioner argues that the permit said on its face that it could be renewed; thus, the two-year limitation was not met. This is a highly speculative argument and during oral argument it was conceded that the permit could not, as a practical matter, be renewed more than twice. Since the permit is only good for six months, with two renewals, the stock could only be offered for a maximum of 18 months. As stated earlier, the stock was in fact sold within the original period of the permit. Therefore, I would hold that the two-year requirement was met. I would emphasize that this holding is confined to the peculiar facts of this case, as they relate to Section 1244 and the absence of guiding regulations during the crucial period.