[No. C056503. Third Dist. Feb. 4, 2009.]

MARIO DELUCCHI et al., Plaintiffs and Appellants, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

Counsel

Harry Gordon Oliver II for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, William L. Carter and George C. Spanos, Deputy Attorneys General, for Defendant and Respondent.

Opinion

**DAVIS, J.**—Plaintiffs (the individuals, couples, and other entities listed in exhibit A of the complaint as the signatories on 58 state tax returns) brought the present action for a refund of approximately $17,000 each in state income tax that they had paid on the balance of proceeds received in 1995 from their 1986 sale of stock. The trial court ruled in favor of defendant Franchise Tax Board (FTB) on cross-motions for summary judgment on stipulated facts. Having timely appealed from the judgment, plaintiffs contend that the FTB must apply the exclusion from taxable income that existed for their particular capital gain in 1986 to their income in the 1995 tax year, even though in 1989 the Legislature had repealed the statute that authorized the exclusion. We shall affirm.

FACTS

The facts, as noted, are undisputed. We therefore do not need to follow the customary three-part paradigm for our de novo review of a ruling on a motion for summary judgment. (*Rio Linda Unified School Dist. v. Superior Court* (1997) 52 Cal.App.4th 732, 734–735 [60 Cal.Rptr.2d 710].)

Each of the plaintiffs sold their shares in Norcal Solid Waste Systems, Inc. (Norcal) in 1986 to an ESOP (employee stock ownership plan and trust). Norcal was a small business within the meaning of former section 18162.5, subdivision (e), of the Revenue and Taxation Code.[1] (See Stats. 1985, ch. 106, § 133, pp. 322, 323–324.)[2] All plaintiffs (but one) owned the same number of shares with an approximate cost basis of $19,000 for which the ESOP paid $417,000 in cash and gave a 14-year promissory note of $234,000 for the balance (we will round all figures to the nearest $1,000). All plaintiffs had held their shares for more than three years before the sale.

All plaintiffs (but one) reported a capital gain of $398,000 from the sale on their 1986 tax returns. Former section 18162.5 (then in effect) provided in

---

[1] Hereafter, undesignated section references are to the Revenue and Taxation Code.

[2] Given the stipulation, we do not need to list the criteria in the statute.

pertinent part that "(b) In the case of any taxpayer, only the following percentages of the gain recognized upon the sale . . . of small business stock shall be taken into account in computing taxable income: [¶] . . . [¶] (3) Zero percent if the small business stock has been held for more than three years . . . ." (See Stats. 1985, ch. 106, § 133, pp. 322–323.)[3] None of the plaintiffs elected to treat the 1986 proceeds as anything other than an installment sale within the meaning of federal tax law, which is a disposition of property involving a receipt of at least one payment after the close of the tax year in which the disposition occurred. (26 U.S.C. § 453(b)(1) (hereafter Int.Rev. Code, § 453); see Rev. & Tax. Code, § 24667, subd. (a)(1) [incorporating provisions of Int.Rev. Code, § 453 defining installment sales and the installment method of taxation].)[4]

At some point, the ESOP defaulted on the promissory notes. In settlement of the ensuing litigation, the ESOP paid $215,000 to every plaintiff (but one) in 1995. They reported a $197,000 capital gain on their tax returns for that year (the parties do not explain the $18,000 difference).

In 2002, plaintiffs filed timely amended tax returns for 1995, seeking a refund of the income tax paid on capital gains from the 1986 stock sales proceeds. The FTB denied their claims, and the State Board of Equalization denied their administrative appeal in a March 2006 determination. They filed this action in June 2006.

### DISCUSSION

Although plaintiffs profess that "the obvious intent of the Legislature" was that the capital gain on the sale of stock held long term in a small business should go untaxed, that would not give any significance to the subsequent legislative action of repealing this favorable treatment in 1989. Therefore, the issue is actually whether some other principle allows them to claim the benefit of the repealed law for proceeds of an installment sale that are received only after the repeal.

■ To state it in simplified form, the method for allocating tax liability for an installment sale of a capital investment calculates the percentage that

---

[3] In 1987, the Legislature repealed former section 18162.5 and enacted former section 18161, which was identical in pertinent part but also contained a sunset clause providing for its repeal as of January 1, 1989. (See Stats. 1987, ch. 1138, §§ 130, 131, pp. 3932–3934.)

[4] The installment method applies automatically to installment sales unless the taxpayer elects to opt out before the due date of the tax return for the year of the property's disposition. (Int.Rev. Code, § 453(a), (d); *Bolton v. C.I.R.* (1989) 92 T.C. 303, 305–306; 26 C.F.R. § 15a.453-1(d)(3)(i) (2008) [to opt out, taxpayer must report "amount realized equal to the selling price including the full face amount of any installment obligation" on return filed for taxable year in which installment sale occurred].)

the gain represents of the total sales price and applies this percentage to each payment received to determine the amount of the total gain that is recognized for tax liability in any particular taxable year. (Int.Rev. Code, § 453(c).)[5]

For example, where the cost basis is $1,050,000 and the sales price is $1.5 million, the capital gain is 30 percent of the total. If this transaction calls for $50,000 annual payments for 30 years, 30 percent of each payment ($15,000) is subject to tax in the taxable year of its receipt, as part of the total capital gain on the transaction.[6] The calculation of this percentage is a direct function of any tax policy that excludes a portion (or even the entirety) of an actual capital gain from tax liability. To stick with our example, if the Legislature wanted to encourage capital investment in the development of solar cells, it might exclude 50 percent of the actual capital gain on the sale of such investment from taxable income in the hope financing seeking such a favorable tax rate would flow to that industry. In that case, only $225,000 of the actual gain would be taxable, and there would be a resulting percentage of only 15 percent to apply to the subsequent payments.

█ The entire argument of plaintiffs boils down to their emphasis on this latter distinction between the actual capital gain and the extent of the *tax liability* for the capital gain, asserting that "Once the gross profit percentage is determined, it does not change in subsequent years." However, while they cite to numerous administrative rulings of the Internal Revenue Service on various types of capital gains involved in installment sales, not one of them includes a situation where Congress has changed the degree to which it treated the tax liability for the capital gain over the course of the installment sale.[7] Cases are not considered authority for propositions neither expressly nor necessarily considered (*Fogarty v. City of Chico* (2007) 148 Cal.App.4th 537, 542, fn. 8 [55 Cal.Rptr.3d 795]), and for the same reason their invocation of these rulings is inapposite.

If a later legislative body determines that the desired effect of a capital gains tax policy has not come about in a particular context and repeals the favorable treatment, it would represent a frustration of legislative purpose to continue the exclusion for future payments (in the absence of any express statutory language to this effect). The installment method is a remedial device for dividing a capital gain into discrete taxable events, in order that all of the

---

[5] We ignore for present purposes any adjustments to the total sales price, or interest on the outstanding principal balance.

[6] This method also results in the assignment of a proportional amount of the total capital gain to a particular taxable year if the installment payments were not equal.

[7] Neither party cites (and we will not independently search for) any *express* provision for ongoing installment sales when there has been a change in the tax treatment of capital gains. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 591, fn. 8 [59 Cal.Rptr.3d 18].)

tax liability is not incurred in the taxable year of an asset's disposition before the seller has all of the sales proceeds in hand to pay the tax liability on it. (*Rickey v. C. I. R.* (9th Cir. 1974) 502 F.2d 748, 753, citing *Commissioner v. South Texas Co.* (1948) 333 U.S 496, 503 [92 L.Ed. 831, 68 S.Ct. 695].) The installment method is neutral on the *separate* issue of determining the tax liability for the part of the capital gain when the income is "recognized" in subsequent years, and the statute does not contain any guarantee that the manner in which the capital gain is treated at the outset will continue from one discrete taxable year to another. (Int.Rev. Code, § 453(c).)

As a result, the characterization of the portion of the profit that a seller receives in a particular taxable year as either a capital gain or ordinary income (and the applicable tax rate) is determined as of *that* taxable year, not the original year of the sale. "As to the instalment sales made in 1923, the taxpayer might have elected to take his whole profit then and have had it taxed under the Revenue Act of 1921. He chose to defer *realization of the profits* on the deferred instalments. These thereby were left to fall under such provisions of the law as might be of force at their maturity. That the law might be changed, *not only in the tax rate but in any other of its provisions*, was a risk the taxpayer took in deferring the realization of his gains. The Board rightly applied to them the law as it stood *when the gains became taxable.*" (*Snell v. Commissioner of Internal Revenue* (5th Cir. 1938) 97 F.2d 891, 893, italics added [treatment of profit changed from capital gain to ordinary income]; accord, *Picchione v. C. I. R.* (1st Cir. 1971) 440 F.2d 170, 172 [same]; *Harry B. Golden* (1942) 47 B.T.A. 94 [exclusion of actual capital gain reduced from 70 to 50 percent]; see *Sirbo Holdings, Inc. v. C. I. R.* (2d Cir. 1973) 476 F.2d 981, 988 [function of Int.Rev. Code, § 453 is one of timing, not characterization; installment method defers *reporting* of taxable gain, but not its characterization].)

Drawing from this precedent, we found that a 1959 change in the treatment of long-term capital gains (an increase in the gain recognized as taxable income from 30 to 50 percent) applied to an installment received after its effective date, a decision cited in the ruling of the trial court in the present matter. (*Andrews v. Franchise Tax Board* (1969) 275 Cal.App.2d 653, 655 & fns. 2, 3, 659–660 [80 Cal.Rptr. 403].)

■ Plaintiffs do not cite any authority to support their idiosyncratic interpretation of the installment method in general or of former section 18162.5. As a result, the FTB correctly denied their claims for a refund of their 1995 tax payments.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

Scotland, P. J., and Cantil-Sakauye, J., concurred.