William A. and Margaret K. TOMBARI, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17405.

United States Court of Appeals
Ninth Circuit.

Feb. 1, 1962.

Rehearing Denied March 5, 1962.

Francis J. Butler, Spokane, Wash., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Robert L. Waters and Kenneth Levin, Washington, D. C., for appellee.

Before CHAMBERS, ORR and DUNIWAY, Circuit Judges.

ORR, Circuit Judge.

William A. Tombari and wife on January 23, 1951, sold to Henry C. Lewis and wife the East Mission Pharmacy (hereinafter the Pharmacy) situate in Spokane, Washington, pursuant to the following agreement of purchase. Total purchase price $300,000.00, payable as follows:

(a) $5,000 cash at execution of the agreement.

(b) $75,987.64 ($75,777.15 principal and $210.49 accrued interest) by the assignment of a real estate contract (hereinafter the Arlington contract) of which the Lewises were obligees.[1]

(c) $19,012.36 in cash before delivery of possession of the property.

(d) $67,157.83 by the Lewises assuming a certain mortgage outstanding against the Pharmacy.

(e) $132,842.17 balance to be paid in monthly installments of $1,000 or more.

Stipulated payments (a) through (d) of said agreement were performed in full during 1951 and the purchasers also made installment payments during that year amounting to $12,770.77. Petitioners (Tombari and wife) reported the sale of the Pharmacy on the installment basis pursuant to the provisions of § 44 of the Internal Revenue Code of 1939, 26 U.S. C.A. § 44.[2] Commissioner challenged this. Petitioners then reported as ordinary income the amounts they collected in excess of their basis (the fair market value) in the Arlington contract, but

---

1. It is stipulated, however, that the fair market value of the Arlington contract at the time of the sale was $50,000.00.

2. "§ 44. Installment basis.

"(a) Dealers in personal property. Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

"(b) Sales of realty and casual sales of [personalty]. In the case * * * (2) of a sale or other disposition of real property, if * * * the initial payments do not exceed 30 per centum of the selling price * * * the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made."

now claim this to have been in error. The Commissioner held that it was not. Tombari and wife then petitioned the Tax Court for a redetermination. The Tax Court sustained the Commissioner and we are asked to review the decision of that court.

The first issue for our consideration is whether the sale of the Pharmacy could properly be reported on the installment basis. The statute requires that in order for the taxpayers to invoke the installment reporting provisions, the "initial payments" in the transaction must not exceed 30% of the "selling price." The parties agree as to the make-up of the "initial payments:"

| | |
|---|---|
| Cash received | $24,012.36 |
| Arlington contract (fair market value) | 50,000.00 |
| Installment payments | 12,770.77 |
| Total initial payments | $86,783.13 |

In dispute at this juncture is the proper manner of computing the "selling price." Petitioners used the fair market value of the Arlington contract in computing the "initial payments," but now make an about face and use face value in making up the "selling price:"

| | |
|---|---|
| Cash | $ 24,012.36 |
| Arlington contract (face value) | 75,987.64 |
| Mortgage assumed | 67,157.83 |
| Contract balance | 132,842.17 |
| Total selling price | $300,000.00 |

The Commissioner held that the Arlington contract's fair market value should also be used in determining "selling price:"

| | |
|---|---|
| Cash | $ 24,012.36 |
| Arlington contract (fair market value) | 50,000.00 |
| Mortgage assumed | 67,157.83 |
| Contract balance | 132,842.17 |
| Total selling price | $274,012.36 |

It is apparent that from taxpayers' figures, the "initial payments" are less than 30% of the "selling price," whereas un-der the Commissioner's computation, the "initial payments" exceed the 30% limit fixed by the statute and hence the transaction does not qualify for installment reporting.

In arriving at the conclusion that the Commissioner's computation is correct, we resort to statutory construction. We must determine the meaning of the term "selling price" as it refers to the valuation of property received, in light of the objectives of this provision of the statute. We are convinced that the fair market value of the Arlington contract, as opposed to the face value accepted by the contracting parties for their own purposes, must govern the computation of "selling price" in this case.

The provision under consideration is a relief measure. It is designed to reduce hardship which otherwise occurs in an installment sale where the whole gain realized on the disposition is taxable in the year of the sale, but more than 70% of the proceeds of that sale is not available to the taxpayer until later years. Thus, under the statute, if 30% or less is paid at the outset, the taxpayer can "spread" his taxable gain over the whole period of the installment arrangement. But to permit the use of a basically speculative figure (as the face value of the Arlington contract here is) in the "selling price" and the more reliable fair market value in the "initial payments," would be to permit installment treatment where the best forecast at the time of the sale indicated no hardship to the taxpayer sufficient for him to invoke the special relief.

Thus, in the instant case if the estimated fair market value of the Arlington contract were to prove accurate upon the contract's final discharge, the taxpayers would have waited to collect less than 70% of the total consideration, a situation not within the contemplation of the special treatment reserved for what the Congress thought to be the more clear-cut hardship cases.

What is required in computing the "selling price" is the best pos-

sible evaluation of the consideration at the time of the sale. In the case of the Arlington contract, said evaluation was its fair market value, as contrasted to the more speculative face value accepted by the parties to the sale. Tax Court cases, on varying fact situations, look uniformly to the "actual bargain" of the parties, rather than to the possibly conflicting contract recitals, in assessing the applicability of the installment reporting provision. See Ludlow v. Commissioner of Internal Revenue, 36 T.C. 102 (1961); Gilbert v. Commissioner of Internal Revenue, 25 T.C. 81, 88 (1955); Boone v. Commissioner of Internal Revenue, 27 B.T.A. 1064 (1935); First Savings & Trust Co. v. Commissioner of Internal Revenue, 20 B.T.A. 272 (1930). We find this approach to be the proper one here as well.

■ We next consider the treatment to be accorded to that portion of each payment received by the taxpayers on the Arlington contract, which portion represented the ratable difference between the fair market value (taxpayers' basis) and the more speculative, or face value of that contract. The difference is of course taxable gain, and the question is whether it is to receive capital gain treatment [3] or is to be taxed at ordinary income rates.

We again are required to resort to statutory construction. The Congress has determined that the favored capital gain treatment should apply only in the case of "the sale or exchange of a capital asset." The policy underlying this provision is evidently that of encouraging, within limits, the free flow, conversion, exchange, investment and re-investment of capital funds, uninhibited by the progressive feature of ordinary income tax rates. Burnet v. Harmel, 287 U.S. 103,

106, 53 S.Ct. 74, 77 L.Ed. 199 (1932). It is a device which permits the adjustment of capital markets so that they reflect the economic potentialities of various investments rather than the more artificial considerations resting upon the consequences of graduated taxation. It is evident, then, that the treatment to be given in the instant case of the retention and collection of a contract obligation was not intended to be the same as that accorded in the case of a typical sale or exchange. There is thus no foundation for expanding the meaning of "sale or exchange" to include retention and collection.

The cases, while only infrequently stating the policy, uniformly reach a result which recognizes it. The distinction between the sale or exchange of a contract obligation on the one hand, and its payment and discharge on the other, was set forth at an early date by the United States Supreme Court in Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939). It has been followed without deviation since. See, e. g., Gersten v. Commissioner of Internal Revenue, 267 F.2d 195, 199 (C.A.9, 1959); Leh v. Commissioner of Internal Revenue, 260 F.2d 489 (C.A.9, 1958); Osenbach v. Commissioner of Internal Revenue, 198 F.2d 235 (C.A.4, 1952); Lee v. Commissioner of Internal Revenue 119 F.2d 946 (C.A.7, 1941); Bingham v. Commissioner of Internal Revenue, 105 F.2d 971 (C.A.2, 1939). See also Hale v. Helvering, 85 F.2d 819 (C.A.D. C., 1936).

Taxpayers urge that the result thus reached is inconsistent with Westover v. Smith, 173 F.2d 90 (C.A.9, 1949). That case, and others of like import,[4] are not controlling here. In Westover, the obligation which was received and

---

3. **"§ 117. Capital gains and losses.**
   "(a) **Definitions.** As used in this chapter— * * *.

   "(4) **Long-term capital gain.** The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into ac-

count in computing gross income * * *."
26 U.S.C.A. § 117.

4. See, e. g., Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931); Commissioner of Internal Revenue v. Carter, 170 F.2d 911 (C.A.2, 1948); Lentz v. Commissioner of Internal Revenue, 28 T.C. 1157 (1957).

was collected subsequent to the original sale transaction had no ascertainable fair market value. As a consequence, the initial transaction was held open and the recognition and taxation of a part of the gain on that transaction was postponed until collection of the obligation. This was done because at the time of the transaction there was no reliable way of determining what the total gain would ultimately be. The collection of the obligation was thus viewed as a part of the original "sale or exchange of a capital asset." Here, on the other hand, a fair market value was stipulated for the obligation and the original transaction was able to be closed promptly. The subsequent collection of the obligation was, as it is ordinarily, a separate and distinct transaction which "is required to stand on its own feet." See Osenbach v. Commissioner of Internal Revenue, 198 F.2d 235 (C.A.4, 1952). That separation of transactions which helps the taxpayer in the deduction of losses, Bingham, supra, must apply also to taxation of gains.

Affirmed.