SCOTT MCCORMAC AND MAY MCCORMAC, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ELEANOR LYNN MCKINLEY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2769–73, 3481–73.   Filed March 17, 1977.

*Scott McCormac,* for the petitioners.
*Stephen B. Zorick, Jr.,* for the respondent.

### OPINION

TIETJENS, *Judge:* Respondent determined deficiencies in income tax against petitioners as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 2769–73............. | 1969 | $2,348.17 |
| 3481–73............. | 1969 | 625.58 |
| | 1970 | 1,548.68 |
| | 1971 | 509.50 |

The question for decision is whether quarterly distributable trust income collected by shareholder-assignee-beneficiaries of a trust after a section 333[1] liquidation is taxable as ordinary income rather than capital gain as claimed by petitioners.

All of the facts having been stipulated, they and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Scott McCormac and May McCormac, docket No. 2769–73, were husband and wife at the time their 1969 income tax return was filed. They were divorced on August 26, 1971.

At the time the petition was filed, petitioner Scott McCormac resided at 310 South Lafayette Park Place, Los Angeles, Calif., and petitioner May McCormac resided at 855 Oak Knoll Circle, Pasadena, Calif.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

Petitioner Eleanor Lynn McKinley, docket No. 3481–73, resided at 1424 N. Crescent Heights Boulevard, Los Angeles, Calif., at the time of filing the petition.

Only the taxable year 1969 is involved in docket No. 2769–73. The taxable years 1969, 1970, and 1971 are involved in docket No. 3481–73.

Hawaiian Guardian, Ltd., a Hawaiian corporation (originally incorporated as Hawaiian Memorial Life Plan Limited), hereinafter called Guardian, was incorporated February 28, 1962, to engage in the business of selling funerals to the public on a pre-need basis.

Guardian was initially capitalized for cash in the amount of $25,000 and issued 500 shares of its stock to all stockholders at a price of $50 per share.

Petitioner Eleanor Lynn McKinley, on or about March 30, 1962, purchased 19 shares of Guardian stock (3.8 percent) for $950 cash. Petitioner Scott McCormac, on or about March 30, 1962, purchased 90 shares (18 percent) of Guardian stock for $4,500 cash.

Guardian began selling pre-need funerals in the State of Hawaii on or about May 15, 1962.

According to an agreement dated February 28, 1962, between Guardian and Hawaiian Memorial Park Mortuary Corp., a corporation, C. S. Gray and Frank Cuelho, a copartnership d.b.a. Williams Mortuary, and Frances Ordenstein, hereinafter collectively referred to as servicing mortuaries, the servicing mortuaries agreed to provide the funeral services in accordance with the pre-need agreements.

The agreement with the servicing mortuaries dated February 28, 1962, provided that the first 25 percent of the moneys collected pursuant to the contract to purchase a pre-need funeral belonged to Guardian to cover selling, administration, and other costs and profit, and that the remaining 75 percent would be deposited in trust with Bishop Trust Co., Ltd., as trustee (hereinafter called Bishop Trust).

An illustration of a hypothetical pre-need sale would be the following: Assume a pre-need funeral price of $1,000. Seven hundred and fifty dollars would be deposited in trust with Bishop Trust as trustee and $250 would belong to Guardian to cover selling, administration expenses, costs, and profit.

Under the hypothetical "sale," the pre-need funeral is all cash, but in reality most of the transactions were time payment plans with a small downpayment, and 60 equal monthly payments until the pre-need contract was paid for. When payments were paid monthly, Guardian, acting as collection agent, would retain the first 25 percent of the contract price and the balance would be paid monthly by Guardian into the trust with Bishop Trust.

Under the terms of the trust agreement with Bishop Trust establishing the trust, the beneficiary of the principal amount deposited in trust (the $750 in the above illustration) is the servicing mortuary. In the event there was no funeral service performed by a servicing mortuary, the beneficiary would be the heirs of the trustor.

The beneficiary of the income earned on investment and the increment on investment of the principal in the Bishop Trust was Guardian. (For example, if stock was purchased by the trust from principal trust funds at a cost of $10 per share, and was later sold at $90 per share, then the $80 increment, less expenses of sale, would belong to Guardian and vice versa, if a loss had been realized, loss would be borne by Guardian.)

Guardian's net sales during its existence were in excess of $7 million. At the time of the dissolution of Guardian, there was approximately $3,600,000 principal actually paid into the trust fund which fund increased to $4,200,000 at the end of 1969, and further increased to $4,500,000 at December 31, 1970, and was $4,900,000 at December 31, 1971. The highest amount reached in this trust was $5,100,000 at December 31, 1973.

The trust funds reached their peak and are gradually diminishing in amount as funds are used to pay for funerals for contract purchasers. As of July 31, 1975, the trust principal was $5 million. Bishop Trust invested the principal of the trust in United States Treasury bills, bank certificates of deposit, preferred stocks, and common stocks during this period. The exact amounts invested in each varied from time to time, depending on market conditions.

In the years prior to 1969, Bishop Trust paid the net income, consisting of interest and dividends, quarterly to Guardian. Guardian reported these income payments as interest and dividend income on its corporate income tax

returns for the years June 30, 1963, to and including its final return of January 28, 1969.

During its existence, Guardian paid cash dividends to its shareholders, including petitioners, as follows:

(a) $48 per share on June 24, 1964.
(b) $30 per share on December 31, 1965.
(c) $100 per share on November 16, 1966.
(d) $40 per share on November 7, 1968.

The total cash dividends for each $50 share of stock paid during this period was $218 per share.

While Guardian's sales were in excess of $7 million, the market became saturated, and in 1968 it was apparent that the company could no longer operate profitably, and for this reason among others, it was dissolved January 28, 1969. Guardian suffered a net operating loss of $63,000 in the last short year (7 months) of its existence. The previous 3 years had shown net profits as follows:

(a) June 30, 1968    $11,000.
(b) June 30, 1967    $54,000.
(c) June 30, 1966    $80,000.

On January 28, 1969, Guardian was liquidated pursuant to section 333 and its assets were distributed to the shareholders, including petitioners, in consideration of the cancellation of their stock in dissolution. Respondent agrees that this section 333 election made by the Guardian shareholders including petitioners met the form and timeliness requirements under the Internal Revenue Code. All of the shareholders of Guardian timely elected section 333 treatment. Respondent does not agree that the use of section 333 of the Internal Revenue Code was valid under these circumstances to convert the quarterly income received by petitioners from Bishop Trust to capital gain.

On January 28, 1969, Guardian assigned to each shareholder, including petitioners, its beneficial interest in the funeral trust with Bishop Trust. This assignment read as follows:

### ASSIGNMENT OF BENEFICIAL INTEREST OF TRUST

HAWAIIAN GUARDIAN, LTD., a Hawaii corporation, hereinafter called "Assignor" (this corporation was formerly called Hawaiian Memorial Life Plan, Ltd., and has been in existence since 1962) hereby assigns, transfers and sets over unto SCOTT McCORMAC, his heirs, successors and assigns,

forever, hereinafter called "Assignee", an undivided eighteen percent (18%) interest in all of the income, gain and increment, of all of the Trusts arising out of sales of pre-need funerals heretofore made by the Assignor, under Trust arrangements between Assignor and Bishop Trust Company, Limited, and individual trust agreements entered into by and between contract purchasers of the Assignor and Bishop Trust Company, Limited.

DATED THIS 28 day of JANUARY, 1969.

HAWAIIAN GUARDIAN, LTD.

By   (S) Clarence H. McKinley     
     CLARENCE H. McKINLEY,
     *President*

By   (S) Henry H. Wong     
     HENRY H. WONG, *Secretary*

CLARENCE H. McKINLEY
TRUSTEE IN DISSOLUTION OF
HAWAIIAN GUARDIAN, LTD.
     (S) Clarence H. McKinley     
     CLARENCE H. McKINLEY, *Trustee*

THE ASSIGNEE, SCOTT McCORMAC, hereby accepts the foregoing Assignment in consideration of the cancellation of his stock in Dissolution.

     (S) Scott McCormac     
     SCOTT McCORMAC

THE UNDERSIGNED hereby acknowledges receipt of the foregoing assignment and agrees to make distributions to the Assignee, or his heirs, successors and assigns; provided, however, that any transfer of this interest by the Assignee shall require a notice in writing to the undersigned.

BISHOP TRUST COMPANY,
LIMITED
By   (S)     
     *V.P. and Trust Officer*

By   (S) R. M. Urun     
     *Trust Officer*

The 90 shares of Guardian owned by petitioners Scott and May McCormac was a capital asset in their hands which had been held for more than 6 months (holding period was 6 years, 9 months, and 28 days) at the time of the dissolution of Guardian. The 18-percent undivided beneficial interest in the trust funds was assigned by Guardian to petitioner Scott McCormac and accepted by petitioner in consideration of the cancellation of his 90 shares of Guardian stock in dissolution. Upon the dissolution, petitioner Scott McCormac did not

receive any cash or any other asset or distribution except the 18-percent assigned undivided beneficial interest.

The 19 shares of Guardian owned by petitioner Eleanor Lynn McKinley was a capital asset in her hands which had been held for more than 6 months (holding period was 6 years, 9 months, and 28 days) at the time of the dissolution of Guardian. The 3.8-percent undivided beneficial interest in the trust funds was assigned by Guardian to petitioner Eleanor Lynn McKinley and accepted by petitioner in consideration of the cancellation of her 19 shares of Guardian stock in dissolution. Upon the dissolution, petitioner Eleanor Lynn McKinley did not receive any cash or any other asset or distribution except the 3.8-percent assigned undivided beneficial interest.

Petitioners Scott and May McCormac's cost basis on their 90 shares of Guardian stock was $4,500, the purchase price. Petitioners Scott and May McCormac attached to their 1969 return a schedule showing their cost basis on the 18-percent beneficial interest in the trust was $11,678.50, consisting of the Guardian stock for which the 18-percent beneficial trust interest was assigned by Guardian to petitioners Scott and May McCormac in consideration of the cancellation of their Guardian stock in dissolution (as set forth in Joint Exhibit 8-H); and $7,178.50, which they reported in their 1969 income tax return as dividend income, such amount being their pro rata portion of the accumulated earnings and profits of Guardian at the time of Guardian's dissolution. Respondent does not contest that this is their pro rata share of the accumulated earnings and profits of Guardian.

The petitioner Eleanor Lynn McKinley's cost basis on her 19 shares of Guardian stock was $950, the purchase price. Petitioner Eleanor Lynn McKinley reported in her 1969 return her cost basis on the 3.8-percent beneficial interest in the trust of $2,465.47, consisting of the $950 cost basis on the Guardian stock for which the 3.8-percent beneficial trust interest was assigned by Guardian to petitioner Eleanor Lynn McKinley in consideration of the cancellation of her Guardian stock in dissolution; and $1,515.47, which she reported in her 1969 income tax return as dividend income, such amount being her pro rata portion of the accumulated earnings and profits of Guardian at the time of Guardian's dissolution.

Respondent does not contest that this is her pro rata share of the accumulated earnings and profits of Guardian.

After January 28, 1969, and continuing to this day, quarterly payments of net income, consisting of interest and dividends from the trust, have been made by Bishop Trust to each of the petitioners.

Petitioners Scott and May McCormac on their 1969 income tax return reported the proceeds received from this trust in 1969 as long-term capital gain on the installment basis. These amounts received in 1969 by petitioners totaled $24,576.56.

The respondent in the statutory notice of deficiency treated the above amount as ordinary income in 1969.

Petitioner Eleanor Lynn McKinley reported on her 1969, 1970, and 1971 income tax returns $5,188.38, $8,740, and $4,750, respectively, as long-term capital gains on the installment basis.

The respondent in the statutory notice of deficiency treated these amounts as ordinary income.

We have described above how Guardian was liquidated pursuant to section 333 and the character of its business—selling pre-need funerals. In those pre-need transactions Guardian received all cash for the contract, retained 25 percent of that cash, and turned over the balance to a trust with Bishop Trust as trustee.

So far as we can ascertain from the record, the residuary beneficiaries of the trust were the mortuaries by whom the funerals were to be performed in the future. But, in the meantime, any increment from the investment of principal not called on for funerals was Guardian's. The principal of the trust was invested in U.S. Treasury bills, certificates of deposit, and stocks. During the years before the liquidation of Guardian, the trust collected dividends and interest on the corpus and paid the net income to Guardian, and Guardian, in turn, distributed them to its shareholders. Guardian reported the amounts so received as interest and dividend income on its own returns.

So, on January 28, 1969, Guardian was liquidated pursuant to section 333. Each of its shareholders received in return for canceled stock a pro rata assignment of Guardian's beneficial interest in the trust. As we see it, this simply amounted to a substitution of each of the shareholders in return for the

cancellation of their stock for a pro rata share of the trust's ordinary income (interest and dividends).

Respondent argues that this transaction, though in form pursuant to section 333, does not result in the amounts received thereafter by the former shareholders becoming entitled to capital gains treatment, and we agree.

Respondent relies on *Mace Osenbach*, 17 T.C. 797 (1951), affd. 198 F.2d 235 (4th Cir. 1952), which, while decided under section 112(b)(7), I.R.C. 1939, the predecessor of section 333, is in point. There the taxpayer received in exchange for stock in liquidation, loans, mortgages, discounts, and other collections. He thereafter received collections on the assets he received in liquidation and the Court held he was not entitled to capital gains treatment. In affirming, the Fourth Circuit at page 237 of its opinion said:

Again, liquidation under Section 112(b)(7) was expressly made elective by Congress. The responsibility of choice was completely that of the taxpayer, who may not fairly complain if, having made the election, the results are not as advantageous as he had hoped. Congress did not try to provide a panacea for all the ills to which shareholders in holding corporations might be heir.

If Congress intended that the transaction should not in its entirety be regarded as closed, we think there would have been express specific provisions in the statute for future taxation of such part as was not regarded as closed. Subsequent transactions must stand on their own feet and be taxable at ordinary or at capital rates depending upon whether or not they fall within the terms of Section 117 which limits "capital gain" to "gain from the sale or exchange of a capital asset". Here taxpayer's subsequent dealings with the loans, discounts, and other claims, did not involve a sale or exchange but collection, and hence, could not qualify as capital transactions, even though his title to the assets had originated in the closed, completed liquidation under Section 112(b)(7).

The present case will be appealable to the Ninth Circuit which has cited *Osenbach* with approval in *Tombari v. Commissioner*, 299 F.2d 889, 892 (9th Cir. 1962). That court has also approved *Osenbach* in *Ralph R. Garrow*, 43 T.C. 890 (1965), affd. 368 F.2d 809 (9th Cir. 1966).

Petitioners here also argue that the above cases are not controlling. They say the asset which they received in the liquidation not only was sui generis but had no ascertainable fair market value, and, citing *Burnet v. Logan*, 283 U.S. 404 (1931), that the transaction was still "open."

We are not bothered by the sui generis ploy. The other argument has no merit. If it does, it was up to petitioners to prove that there was no ascertainable fair market value. They have not even tried. The trust assets were known, the ages, etc., of the prospective burial candidates could have been ascertained, and we have no doubt that, if the rights received by the former stockholders (petitioners here) had no ascertainable fair market value, it could have been so established by proof. This has not been done.

We hold that respondent's determination, that the amounts received by petitioners under their assignments of beneficial interest were not capital gain but ordinary income, is correct.

Consequently, it is not necessary for us to decide whether petitioners were entitled to report on the installment basis. They could not.

We could have written less by concluding right off that since this case is appealable to the Ninth Circuit and since that court has decided the issue for the Government in *Tombari,* 299 F.2d 889, we are bound by that holding under *Jack E. Golsen,* 54 T.C. 742 (1970).

*Decisions will be entered for the respondent.*