ARTHUR L. BLAKESLEE, III and MARY B. BLAKESLEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Blakeslee v. Commissioner
Docket No. 10593-75.
United States Tax Court
T.C. Memo 1977-371; 1977 Tax Ct. Memo LEXIS 68; 36 T.C.M. (CCH) 1511; T.C.M. (RIA) 770371; October 27, 1977, Filed Sherin v. Reynolds,John S. Mason, Jr., and John E. Drew, for the petitioners. Justin S. Holden, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' *69 Federal income tax for the calendar year 1973 in the amount of $183,333. Certain issues raised in the pleadings have been conceded by respondent, leaving for decision whether petitioners properly reported the amount of $464,300 which they received in 1973 as a long-term capital gain. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Arthur L. Blakeslee, III and Mary B. Blakeslee, husband and wife, filed a joint Federal income tax return for calendar year 1973 with the Director, Internal Revenue Service Center at Andover, Massachusetts. At the time of filing the petition in this case, they resided in West Hartford, Connecticut. Arthur L. Blakeslee, III was employed by The Life Insurance Company of Virginia after college in 1949. After two years there, he returned to school and obtained a master's degree in business administration from the Harvard Graduate School of Business Administration. He then joined the management consulting firm of Bowles, Andrews and Towne in Richmond, Virginia. In 1955, he began working on the account of one of the firm's clients, Variable Annuity Life Insurance Company (VALIC). VALIC was a company founded by *70 John D. Marsh to market commercially the variable annuity. In his capacity as a consultant, Mr. Blakeslee assisted Mr. Marsh and other VALIC officers in such tasks as organizing the company, developing variable annuity contract forms, and establishing the company's operating procedures. Throughout the late 1950's, Mr. Blakeslee assisted VALIC with problems it encountered with the Securities and Exchange Commission (SEC) relating to whether the variable annuity contracts were securities subject to SEC regulation. This controversy was ultimately resolved against VALIC by the Supreme Court in 1959. In 1959 and 1960, Mr. Blakeslee assisted VALIC in its relations with the SEC. In 1960 at Mr. Marsh's request, Mr. Blakeslee quit his job with Bowles, Andrews and Towne and became the second ranking executive of VALIC at a salary of $22,500. Mr. Blakeslee had purchased some stock in VALIC while employed with Bowles, Andrews and Towne. As one of his requirements for joining VALIC and for the purpose of obtaining an equity participation in the company, he acquired an option to purchase 5,000 more shares of stock, 1,000 per year, at a price of $12 per share. This stock was to be purchased *71 from a pool of stock created by Mr. Marsh and the other shareholder of VALIC. Other key employees likewise had an opportunity to purchase stock. Mr. Blakeslee exercised his option to the fullest extent consonant with his period of service and ultimately obtained 4,416 shares of VALIC stock by this means. Mr. Blakeslee left VALIC in April 1965 to start his own management consulting firm specializing in the variable annuity area within the life insurance industry. He consulted with approximately twelve insurance companies and principally guided them in establishing their variable annuity operations, developing their contracts and registering them and their contracts with the SEC. When Mr. Blakeslee was employed by Bowles, Andrews and Towne he had participated in its profit sharing plan. He also invested in the stock of one client company that he thought had promise. Thereafter when he owned his own consulting firm, he made a practice of investing in the stock of his clients when he thought they offered "real opportunities for capital growth." In 1965, Mr. Marsh, the founder and chief executive officer of VALIC, resigned his position with that company and became interested *72 in a similar company, Participating Annuity Life Insurance Company (PALIC). Mr. Marsh acquired control of PALIC on March 25, 1966. On June 28, 1966, Mr. Blakeslee purchased 3,864 shares of the common stock of PALIC from Mr. Marsh at a price of $6.47 per share. Ten percent of these shares were purchased on behalf of Mr. Blakeslee's father, who paid Mr. Blakeslee for them. Mr. Blakeslee's interest constituted 7/10's of one percent of the ownership of PALIC. Mr. Blakeslee operated his own management consulting business at the time of the purchase and he continued to do so for approximately one year after the purchase of this stock. During that year PALIC was one of his clients. Soon after gaining control of PALIC, Mr. Marsh determined that PALIC needed additional capital if it was to fully realize its potential, since the capital and surplus requirement for variable annuity life insurance companies was $16 million in California, one of PALIC's potential markets. Investors were sought, beginning in the summer of 1966, and Mr. Blakeslee advised and consulted with Mr. Marsh regarding various sources of additional capital. A potential supplier of capital, Aetna Life Insurance Company *73 (Aetna), was found. However, one of its conditions was that it eventually acquire 100 percent of the stock of PALIC. On February 15, 1967, the shareholders of PALIC were notified that Aetna was offering to purchase all of the outstanding stock of PALIC, other than that of Mr. Marsh, $8for per share. At this time, Aetna and Mr. Marsh were negotiating an agreement under which Mr. Marsh would sell his PALIC stock at a future date at a price to be determined by an agreed formula. Mr. Blakeslee participated in these negotiations. Mr. Marsh was unwilling to sell his stock outright because he wanted to participate in the growth of the company. Through Mr. Marsh, Mr. Blakeslee attempted to obtain a similar agreement with Aetna but was unsuccessful. Mr. Blakeslee received a letter from Mr. Marsh dated February 16, 1967, in which their then current understanding of their future relationship with PALIC was outlined. This letter recited in pertinent part: 1) You will become Executive Vice President at a salary of $35,000. per year, with an increase of $5,000. at the end of one (1) year. 2) You will be the only officer holding such title and as Executive Vice President you will, *74 in the absence of the President, act for him in all matters. 3) At the annual Stockholders Meeting in April of 1968, I will use my best efforts to cause your election to the Board of Directors, and will recommend your selection as a member of the Executive Committee. 4) You will sell to me the shares which you now own in PALIC under the following conditions: A. $8.00 per share, plus B. Ten percent (10%) of PALIC's underwriting gain and loss, plus ten percent (10%) of the value of the business on the books of the Company at the time of my termination as PALIC's Chief Executive Officer. The manner in which these items will be calculated will be the same as contained in the agreement between myself and the Aetna Life & Casualty Company concerning [* * *] [1] will be determined, and the date on which such amounts will be payable, if different from my contract with the Aetna, will be in accordance with the arrangements reduced to writing in a separate undertaking. 5) This Agreement is contingent upon the consummation of the sale of the controlling interest of PALIC to the Aetna *75 Life & Casualty Company, and no announcement of your affiliation with PALIC will be made until it is effective. At such time you will notify all of your clients of this affiliation, and as soon as possible thereafter you will complete the major projects for such clients in which you are then engaged and join PALIC as Executive Vice President. In the interim, you will continue as a consultant to PALIC, devoting as much time as possible to its needs at the rate of $25. per hour. However, on February 17, 1967, Aetna sent to Mr. Marsh a memorandum of its understanding with him. This memorandum stated that the parties, Aetna and Marsh, had tentatively agreed to purchase and sell, respectively, all of the stock then owned by Mr. Marsh. The memorandum stated that the parties did not contemplate that Mr. Marsh would either dispose of any stock or purchase any additional stock. Furthermore, Aetna's obligation in the memorandum was expressly conditioned on its acquisition of all shares of PALIC not owned by Mr. Marsh. Mr. Marsh was to become President and Chief Executive Officer of PALIC. Because Mr. Marsh could not acquire additional stock under his agreement with Aetna, on February 23, 1967, he *76 sent to Mr. Blakeslee a letter outlining a revised understanding. It was essentially identical to the letter of February 16 except that item four was deleted and replaced with a paragraph that read: 4) A separate Agreement will be developed between us, which will in essence give you a ten percent (10%) participation in any amounts which I receive from the Aetna for my tock which exceeds $2,357,000. This agreement was intended to give the same result as the February 16 agreement. On March 7, 1967, Aetna, Mr. Marsh and First Pyramid Life Insurance Company, which owned 24.6 percent of PALIC, entered into a formal agreement for the sale of PALIC stock held by them. First Pyramid sold its stock for $8 per share. The terms of sale with respect to Mr. Marsh were substantially those of the February 17 memorandum. The sales price was to be determined by a formula based on future performance of the company, and the actual exchange would occur no later than January 1, 1973. On March 12, 1967, Mr. Blakeslee sold his PALIC stock to Aetna for the offered price of $8 per share. He was willing to sell his stock to Aetna at this price because of the agreement he had reached with Mr. Marsh. *77 Aetna also acquired all of the PALIC stock held by PALIC's other shareholders, except that held by Mr. Marsh. The closing was held on March 30, 1967. Mr. Marsh's stock was placed in escrow pursuant to his agreement with Aetna. On March 27, 1967, both Mr. Blakeslee and Mr. Marsh executed a letter that would "serve as an understanding of our future relationship in" PALIC. The terms of the understanding were identical to those of the letter Mr. Marsh sent Mr. Blakeslee on February 23, 1967. Shortly after March 27, 1967, Mr. Blakeslee began to disengage from his management consulting business. He commenced employment with PALIC [2] as its Executive Vice President on July 10, 1967. In the 27 months Mr. Blakeslee worked as a private consultant his net earnings were $160,000. His initial salary at PALIC was $35,000. Mr. Marsh and Mr. Blakeslee executed a document entitled "Participation Agreement" on September 10, 1968. This agreement stated in pertinent part: *78 WHEREAS, Marsh, by a Purchase Agreement dated March 7, 1967, to which reference is hereby specifically made, has contracted to sell all of his shares of capital stock of Participating Annuity Life Insurance Company ("PALIC") to Aetna Life Insurance Company ("Aetna"), the sale to be consummated on a date ("Sale Date") to be determined under Article III of the said Purchase Agreement, and WHEREAS, the consideration to be received by Marsh under the said Purchase Agreement is to be calculated, in part, by a formula which takes account of the financial success of PALIC during the period from April 1, 1967, to the Sale Date, and WHEREAS, Marsh believed that the employment of Blakeslee as Executive Vice-President of PALIC would materially enhance the financial success of PALIC and thereby increase the total consideration to be received by Marsh for his shares of capital stock of PALIC, and WHEREAS, by a letter agreement dated March 27, 1967, Blakeslee agreed to become Executive Vice-President of PALIC on the condition that a separate agreement be developed under which Blakeslee would participate in that part of the consideration to be received by Marsh under the said Purchase Agreement *79 which is attributable to financial success of PALIC, NOW THEREFORE, in consideration of the mutual promises and agreements hereinafter set out, and in accordance with the March 27, 1967, understanding of the parties, it is agreed that: ARTICLE ONE
Blakeslee agrees that, while an officer of PALIC, he will devote his entire time and attention and his best energies and abilities to the promotion of the financial success of PALIC. ARTICLE TWO
If Blakeslee continues to serve as an officer of PALIC at all times from the date of this Participation Agreement to the Sale Date, Marsh agrees to pay Blakeslee an amount equal to ten percent (10%) of the amount by which the total consideration received by Marsh from Aetna under the said Purchase Agreement exceeds $2,357,000.00. ARTICLE THREE
If, after the date of this Participation Agreement but before the Sale Date, Blakeslee ceases to serve as an officer of PALIC, Marsh will pay to Blakeslee, if living, otherwise to Blakeslee's estate, an amount equal to the amount that otherwise would have been payable to Blakeslee under ARTICLE TWO of this Participation Agreement, multiplied by a fraction, the numerator of which shall *80 be the period during which Blakeslee serves as an officer of PALIC prior to the Sale Date plus the period from April 1, 1967, to July 10, 1967, and the denominator of which shall be the period from April 1, 1967, to the Sale Date; provided however, that if Blakeslee resigns from his position with PALIC on or before July 10, 1969, Blakeslee shall receive nothing under this Participation Agreement. ARTICLE FOUR
Any amount payable under ARTICLE TWO or ARTICLE THREE of this Participation Agreement shall be paid in a single payment, without interest, not later than sixty (60) days after receipt by Marsh from Aetna of the total consideration to which Marsh is entitled under the Purchase Agreement. On January 1, 1973, Mr. Marsh received $7 million from Aetna for the sale of his PALIC stock pursuant to their agreement of March 7, 1967, as amended on December 16, 1971. That same month Mr. Blakeslee received $464,300 from Mr. Marsh in accordance with their agreement of September 10, 1968. This amount was 10 percent of the amount Mr. Marsh received for his stock in excess of $8 per share. At the time Mr. Blakeslee received this payment, he was President and Chief Executive Officer *81 of PALIC and had a salary of $82,000 per year. At the time of the trial in this case, Mr. Blakeslee was a vice president of Aetna. On their Federal income tax return for 1973, petitioners reported the $464,300 received by Mr. Blakeslee as a long-term capital gain. It was described on the return, without further explanation, as "net proceeds from joint venture with John D. Marsh which commenced in 1967." In his notice of deficiency mailed to petitioners, respondent determined "that the sum of $464,300 you received from John D. Marsh during the tax year 1973 is taxable as ordinary income." OPINION Petitioners assert that the issues before the Court are whether Mr. Blakeslee's contractual agreements with Mr. Marsh constitute "a property right or a capital asset as defined by" section 1221, I.R.C. 1954, [3] and whether the $464,300 payment received by Mr. Blakeslee in 1973 pursuant to these agreements should be taxed as a long-term capital gain. Respondent has argued that under those agreements Mr. Blakeslee had only a right to receive income under an employment contract and that he held no capital asset. *82 For the taxable year 1973, section 1222(3) defined long-term capital gain to be "gain from the sale or exchange of a capital asset held for more than 6 months * * *." [4]Section 1221 states that "the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include" certain classes of assets not here relevant. In a sense contract rights are property rights, and thus they may fall within the definition of "capital asset." However, all property rights are not capital assets, even though they do not fall within a specifically excluded category of section 1221. Commissioner v. Gillette Motor Transport,Inc.,364 U.S. 130, 134-135 (1960). Therefore, each distinguishable right under a contract must be examined to determine whether it qualifies as a capital asset. See Commissioner v. Ferrer,304 F.2d 125, 131-33 (2d Cir. 1962), affirming in part and reversing in part 35 T.C. 617 (1961). As noted by the Court in Commissioner v. Ferrer,supra at 129-30, characterization of a particular contract right is a difficult task, made more so by the lack of any *83 universal standard for the determination. However, the Court did provide the following analysis: One common characteristic of the group [of cases] held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in * * *, or an "encumbrance" on * * *, or an option to acquire an interest in * * *, property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another * * *, or by rendering services * * *, or by virtue of ownership of a larger "estate" * * *. *84 We find that Mr. Blakeslee did not have rights under his contract similar to those described in the first sentence of this analysis. Instead, his rights are described in the second sentence. He had only an opportunity to obtain receipt of income by rendering services, and this is not a capital asset. See Pounds v. United States,372 F.2d 342 (5th Cir. 1967); Hodous v. Commissioner,14 T.C. 1301 (1950); McFall v. Commissioner,34 B.T.A. 108 (1936). Neither the agreement of September 10, 1968, under which Mr. Blakeslee was paid, nor the written understandings of the parties underlying it granted to Mr. Blakeslee any rights in Mr. Marsh's stock. The 1968 agreement provided only that Mr. Marsh would pay Mr. Blakeslee an amount of money, determined by a formula, in return for the performance of certain activities by Mr. Blakeslee as an officer of PALIC. The formula used in calculating the amount of money due Mr. Blakeslee on performance of the activities contained two variables, the amount Mr. Marsh received for stock he was selling to Aetna in excess of $2,357,000 (Mr. Marsh's 294,660 shares multiplied by $8 per share) and the length *85 of Mr. Blakeslee's service as an officer of PALIC. There is a critical distinction between an interest in specific property and a claim against Mr. Marsh personally for a sum of money, the amount of which is determined by some mathematical relationship to the sales price of the specific property. Although in one sense Mr. Blakeslee participated in the success of Palic/ by becoming entitled to increased amounts of money on its success, he did so not as an owner of stock or any interest in stock. Mr. Blakeslee became entitled to the increased amount of money only upon performance of certain services under his contract and only because of that performance. The earlier understandings between Mr. Marsh and Mr. Blakeslee do not change the nature of their ultimate bargain. In the February 16, 1967, understanding, Mr. Blakeslee was to perform services as an officer of PALIC and was to sell his PALIC stock to Mr. Marsh. The sales price was to be $8 per share plus a factor reflecting the success of the company. This plan became unfeasible when Aetna required Mr. Marsh not to purchase additional stock as a condition of its agreement to acquire the stock then held by Mr. Marsh for a flexible *86 price. Had Mr. Marsh purchased Mr. Blakeslee's stock, his agreement with Aetna would have encompassed a higher amount of stock. This did not occur. However, Mr. Marsh was willing to pay Mr. Blakeslee 10 percent of the amount he received from Aetna in excess of $8 per share for the stock he held without purchasing Mr. Blakeslee's stock. They determined to develop an agreement that would "in essence give [Mr. Blakeslee] a ten percent (10%) participation in any amounts which [Mr. Marsh] received from the Aetna for [his] stock which exceeds $2,357,000." Only a right to a portion of certain proceeds was granted by the terms of these understandings. No interest in the stock itself was mentioned. Indeed, it would appear that Mr. Marsh was not only precluded from acquiring more stock but also from disposing of any of his stock under his agreement with Aetna. The only consideration for the payment stated in the letters of February 23, 1967, and March 27, 1967, was performance of services by Mr. Blakeslee. In fact, petitioners do not even argue that they received any interest specifically in Mr. Marsh's stock. [5] Nor have they offered any proof, much less any "strong proof," that *87 the form of the agreements did not reflect the substance of their agreement. See Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Pritchett v. Commissioner,63 T.C. 149, 171 (1974). Instead, petitioners have advanced several other arguments for the purpose of showing that Mr. Blakeslee held a capital asset. We find that none of these arguments have merit. Petitioners argue that consideration other than Mr. Blakeslee's services was given in exchange for payment under Mr. Blakeslee's contract. They assert that this other consideration was an agreement by Mr. Blakeslee to sell his stock in PALIC to Aetna. Petitioners assume that their receipt of $464,300 under *88 these circumstances would be taxed as a long-term capital gain. We need not address this assumption, since the facts asserted find no support in the record. It is true that purchase by Aetna of all outstanding PALIC stock was a condition of its contract with Mr. Marsh and that sale of Mr. Blakeslee's stock occurred near the time of his agreements with Mr. Marsh. However, there is no evidence in this record that sale of Mr. Blakeslee's stock to Aetna was bargained for as consideration for Mr. Marsh's obligations under the contract. The terms of the contract indicate no such consideration, and, absent strong proof that the form of the contract does not reflect the true bargain, petitioners cannot succeed in attacking the form they themselves chose. See Ullman v. Commissioner,supra;Pritchett v. Commissioner,supra.The fact that Mr. Blakeslee was willing to sell his PALIC stock to Aetna at $8 per share because he had reached his understanding with Mr. Marsh speaks only to Mr. Blakeslee's motives and not to the bargain reached between the parties. There is no evidence that Mr. Blakeslee would not have sold his stock to Aetna for $8 per share *89 as did the other PALIC stockholders had he not negotiated the contract with Mr. Marsh. Petitioners argue that Mr. Blakeslee merely substituted one capital asset, his PALIC stock, for another, his contract rights, or that he merely substituted the evidentiary form of his capital asset from stock in PALIC to his contract rights. The record is lacking in evidence to support this contention. Also, the first of these arguments merely begs the question whether the contract rights were a capital asset. If the record supported petitioners' contention of an exchange of a capital asset for other property (which it does not) it would not automatically follow that the other property was a capital asset. The status of the property received in exchange for the capital asset would be determined by its own character and the manner in which the property is held. In any case, neither argument has any basis in fact. No substitution occurred such as described, except in the loose sense that Mr. Blakeslee may have deemed it so. The PALIC stock was sold in one distinct, closed transaction, and the contract rights were acquired in another. Surrender of the stock and acquisition of the contract rights *90 were not related in any sense helpful to petitioners. Petitioners also assert that "the origin of the payment to the petitioner is * * * capital in nature" because of the holdings in Thermoclad Co. v. Commissioner,T.C. Memo. 1974-289, and Kutz v. United States,392 F.Supp. 539 (M.D. Pa. 1975). The Kutz case involved a transaction quite similar to that in the instant case, but the taxpayer involved was the payor of the contract payments and not the payee. In the Kutz case, the payor attempted to deduct the payment under section 212. The district court held that the payor's expense was capital since the origin of the expense was the process of sale of a capital asset. Petitioners gain nothing from the analysis in this case. Mr. Blakeslee's receipt is not characterized by the origin of the payor's expense but by the origin of his receipt, which was the contract between him and Mr. Marsh. We have found this contract to be other than a capital asset. Thermoclad Co. v. Commissioner,supra, deals with a redemption of stock under facts totally different from the facts in the instant case. Neither of these cases aids *91 petitioners' argument in this case. Finally, petitioners make two related arguments for their position that the payment received by Mr. Blakeslee could not be compensation for services, the characterization urged by respondent. They argue that there was no employer-employee relationship between Mr. Blakeslee and Mr. Marsh and that the amount paid, when added to Mr. Blakeslee's Aetna salary, would be considered unreasonable compensation. Petitioners' argument on this point is misplaced.Income received by Mr. Blakeslee is ordinary income unless petitioners establish it to be otherwise under some specific statutory provision, regardless of its characterization as compensation for services. Petitioners have failed to establish that they are entitled to any treatment of the $464,300 received other than as ordinary income. However, we find that in fact this sum was received as compensation for services. Under his agreement, Mr. Blakeslee received the amount in return for the services he was to perform. That he was employed by Aetna to perform those same services does not alter this fact. One need not be a common law employee to receive compensation for services. See, e.g., General Artists Corp. v. Commissioner,17 T.C. 1517 (1952), *92 affd. 205 F.2d 360 (2d Cir. 1953), cert. denied 346 U.S. 866 (1953). Furthermore, the amount of Mr. Blakeslee's compensation was bargained at arm's length with Mr. Marsh. There is no reason to believe that on the facts of this case the amount was unreasonable or that it was paid for something other than services. In any event, section 61 includes in gross income all "compensation for services," not just reasonable compensation for services. We hold that the $464,300 received by Mr. Blakeslee from Mr. Marsh in 1973 was ordinary income and not capital gain. Decision will be entered under Rule 155. Footnotes
1. One line of this letter was apparently omitted in the original by typographical error.↩
2. By this time, the corporate name of PALIC had been changed to Aetna Variable Annuity Life Insurance Company. However, for simplicity, we have continued to call the corporation PALIC throughout this Opinion.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
4. In our view this case could properly be disposed of on the basis that the receipt of $464,300 by Mr. Blakeslee pursuant to the terms of his contract does not satisfy the "sale or exchange" requirement of sec. 1222(3) regardless of whether the contract was a capital asset. See Tombari v. Commissioner,299 F.2d 889, 892 (9th Cir. 1962), affg. 35 T.C. 250 (1960); United States v. Fairbanks,95 F.2d 794 (9th Cir. 1938), affd. 306 U.S. 436 (1939); Watson v. Commissioner,27 B.T.A. 463, 465↩ (1932). The record is clear that Mr. Blakeslee sold his PALIC stock to Aetna in 1967 and retained no interest in that stock. He never acquired any interest in Mr. Marsh's stock. In 1973 he received a payment of $464,300 from Mr. Marsh pursuant to his contract with Mr. Marsh. He did not "sell" or "exchange" this contract. However, the parties argued this case only on the issue of whether Mr. Blakeslee held a capital asset. We will therefore consider and decide this issue.
5. Petitioners have argued that under his contract Mr. Blakeslee was given an "equity interest" in PALIC under which he had a "right to participate in the capital growth and appreciation"of PALIC. However, as we have noted, Mr. Blakeslee's right to receive money and thus "participate" in the growth of PALIC was derivative in nature and, by the terms of his contract, originated not from any equity in PALIC but from his employment contract.↩